IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v. No. 4:19CR00418 SWW

August 19, 2022
Little Rock, Arkansas
1:00 PM

BILAL AL-RAYANNI,

Defendant.

**TRANSCRIPT OF SENTENCING HEARING**
BEFORE THE HONORABLE SUSAN WEBBER WRIGHT,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

On Behalf of the Government:

MS. STACY WILLIAMS, Assistant U.S. Attorney
U.S. Attorney's Office
425 West Capitol Avenue, Suite 500
Post Office Box 1229
Little Rock, Arkansas 72201-1229

MR. ANDREW SIGLER, Assistant U.S. Attorney
U.S. Department of Justice
National Security Division - Counterterrorism
950 Pennsylvania Avenue North West - 4CON
Washington, DC 20530

On Behalf of the Defendant:

MR. JOHN WESLEY HALL, Attorney at Law
Law Offices of John Wesley Hall, Jr., PA
1202 Main Street, Suite 210
Little Rock, Arkansas 72202

Interpreter: Sonia Nasief

*Proceedings reported by machine stenography; transcript prepared utilizing computer-aided transcription.*

(Proceedings commencing in open court at 1:00 PM.)

THE COURT: This is a sentencing hearing in United States versus Bilal Al-Rayanni. Mr. Al-Rayanni is here with Mr. John Wesley Hall, his lawyer, and an interpreter Ms. Sonia Nasief. How do you pronounce your name?

THE INTERPRETER: Nasief is right, Your Honor.

THE COURT: Thank you. The United States is represented by Ms. Stacy Williams and Mr. Andrew Sigler. And will you introduce the agent?

MS. WILLIAMS: Yes, Your Honor. This is Special Agent Brad Harvey.

THE COURT: All right. Good afternoon. I would like for Mr. Hall to come forward with Ms. Nasief and with Mr. Al-Rayanni. You can spread out if you want, because of COVID, but I just want to swear first the interpreter and then I want to swear Mr. Al-Rayanni.

(Interpreter sworn.)

THE COURT: Will you swear the defendant?

**BILAL AL-RAYANNI, DEFENDANT, DULY SWORN**

THE COURT: Mr. Al-Rayanni, are you under the influence of any drugs or medicine or alcoholic beverages today?

THE DEFENDANT: No.

THE COURT: Mr. Hall, do you believe he's competent to proceed?

MR. HALL: He is. We met in the lock-up with the interpreter so he could get to meet her for about 15 minutes before we were here today.

THE COURT: I find he's competent and we will proceed. Mr. Al-Rayanni, if I'm speaking too quickly or if anyone says anything you don't understand with your interpreter's help, please let us know. Do you understand that?

THE DEFENDANT: Yes. Yes.

THE COURT: Mr. Hall, I want you to know that I am in receipt of your memorandum, your sentencing memorandum, which is really an objection to the presentence report. But do you and your client have any other objections? Other than you object to two enhancements, do you have any other objections?

MR. HALL: No, ma'am.

THE COURT: What I will do then is ask the United States, Ms. Williams, do you have any -- the burden is on you to support these enhancements. Would you like to put on some evidence or argument now?

MS. WILLIAMS: Argument, I guess, Your Honor. We don't have evidence.

THE COURT: All right. I will now ask that again, I apologize, if you all will just step aside so I can watch the lawyers for the United States. I apologize for having you all come up here, but this courtroom is a great big cavern and I'm

looking right at the sun. So it's at the windows so I just like to have people where I can see them well. My vision is not the best anyway. Thank you.

MS. WILLIAMS: Your Honor, as to the enhancement in 2M5.3(b)(A), the United States believes that is fairly clear from the reading of the guidelines that the offense involved a provision of dangerous weapons, firearms, and obviously he was running security for AQAP and he had a firearm. The United States believes that in itself, the offense conduct grants that that should be -- that enhancement should be applied in this case.

THE COURT: All right. Mr. Hall, I'm going to let you respond from where you are. If you would, remain seated and you can use that microphone.

MR. HALL: He was provided a firearm. He had a firearm clearly, but our view is it was given to him as a part of enlisting him into this escapade if you want to call it that in the Yemeni Civil War. He was there as a visitor, he didn't come obviously with a gun because he couldn't have flown with one, but he gets into Yemen, he's there for six months, and then they oppress people into the war. Our view was if we tried this case, we'd have to show that the Yemen civil war had Al-Qaeda taking every male.

And there's pictures on his phone of children with him as part of this. And he didn't recruit the children, Al-Qaeda

did, they bring them all together. And the most striking thing for me is, not being of Middle Eastern descent, that I kept thinking of World War II which I studied greatly growing up that the Nazis impressed 12-year-old boys and 65-year-old men in the war at the tail end because they were running out of soldiers. And that's similar to what Al-Qaeda was doing. Anybody that could walk that was male was going to be brought into this fight.

THE COURT: The Russians are getting prisoners now, I believe, to help with the war in Ukraine. I read that the other day. Anyway, I understand your point.

MR. HALL: It's too depressing to even think about the war in Ukraine. Now that I'm versed in war crimes having done one, I watch the news and say, that's a war crime and that's a war crime. And it's just inevitable it's going to be horrible when this is over. Not that the war itself isn't horrible. But anyway, he did not provide a weapon. He was given a weapon, he carried a weapon. It was for whatever show that security would have the weapon, and he had a knife, but you could look at the knife in the pictures. It's one with these long curved blades, it looks like he can't even get it out of the scabbard that it was in.

It's something that seems to be more decorative of the tribes in the country at the time, not of any effective use. If you see any of the ISIS videos, and that's what I refer to

in that footnote, I watched a lot of those ISIS videos because I was curious as to what they were doing. When they beheaded somebody, it was usually just a standard knife that anybody in the military would carry.

THE COURT: You said in your memo they just -- they were after other Muslims. They've killed Christians too.

MR. HALL: Well, I saw or heard on the news today somebody was sentenced in Virginia from a trial in April, and Mr. Sigler would know more about that because he probably was on the periphery of that case, but that was a killing of an American in Syria?

MR. SIGLER: It's a beheading.

MR. HALL: A beheading of more than one, and somehow they captured him and brought him back to the U.S. for trial. And in this case because we don't have any acts of violence, don't have any threats other than possessing a gun which at the time in Yemen means essentially nothing, if anybody can traipse through the Michigan State Capitol carrying an AR-15 and get away with it, they can, they did. That doesn't necessarily mean anything.

MR. SIGLER: If I may speak briefly, Your Honor, just to rebut or to answer some of those points. The Eastern District of Virginia sentencing was for the murder of James Foley and Steven Sotloff, and was up to a death-penalty-liable offense and it includes life imprisonment, and that's what he

got. That's a radically separate set of facts than we confront here. The theory here, and it's what he's pled guilty to, is knowingly providing material support to AQAP in the form of personnel and services, himself as personnel, and services to the terrorist organization. The guideline B1 does not say if the defendant provided firearms.

It says if the offense involved the provision of firearms. Respectfully, even if he was in the driver's seat of the Toyota as we know from the documentary evidence in this case, he did not have to be leading the effort to provide the firearms. He was part and parcel of that offense. And I think by just a simple application of the facts to the guideline it applies in this case.

MR. HALL: And he did provide his body. Our defense at trial would have been he was pretty much made to do it, but he could have broken away at some point, because he did when he came back to the U.S. finally after six months. But his body alone driving the truck, I agree, is providing personnel.

MR. SIGLER: I'll just note we do not have a witness here today. If it had gone to trial, we were prepared to bring a witness from the Pentagon as well as another witness from Yemen. The Yemeni witness would have said you don't put those badges on your dagger, you don't put those badges on your gun unless you want to be seen as part of the terrorist groups. So I'd respectfully submit when we look at the gravamen of the

evidence in this case, that these were conscious choices that the defendant made. We'll leave it at that.

THE COURT: Is there any reason I shouldn't rule?

MR. HALL: No, ma'am.

THE COURT: This one is easier for me than the next objection will be. But I overrule the objection because I find that the photographs and videos are sufficient to support an inference that this defendant had the intent, knowledge or reason to believe that his support of Al-Qaeda or Al-Qaeda and the Arabian peninsula or whatever this was called, was to be used to commit or assist the commission of a violent act. In other words, the AK-47s, the men hanging out of the Jeep with him, the weapons, the badges, the flag, all of those I think are sufficient to support an inference of that intent. I know that he never said this is what I intended, but they were found on his telephone. So I overrule that objection.

Now, just stay up here if you would, Mr. Hall, because your next objection you might want to enunciate again with respect to -- and this is the one, the 12-point enhancement in paragraph 21, and it's under Section 3A1.4(a) of the guidelines, and really I'll just narrow it right down. For me, the question is whether this is, what is it called, a federal crime of terrorism. Not every terroristic act is a federal crime of terrorism. And this is a huge enhancement and I know it surprised you. It really kind of surprised me too, I will

say.

And I have struggled with -- I've read some of the annotations to cases that used or refused to apply this enhancement. The cases don't provide a whole lot of guidance with respect to a situation in a civil war, and I'll just -- this is my -- I want you all to address this and you can address other things as well. Nothing in the presentence report indicates that this defendant through the photographs and all was engaged in anything other than intimidating the Houthis, and they're not a government. They want to be a government. They've taken over a capitol. But the Houthis really are rebels against a government. And Al-Qaeda at this juncture, as far as I can tell, was fighting the Houthi rebels. I know Al-Qaeda has fought more than one party in Yemen. And I know it's a humanitarian disaster, but that's not the issue. The issue is whether under -- what is the statute?

MR. SIGLER: The definition is 2332b(g)(5).

THE COURT: I have that marked. This is my question. And I'll read from section 5. The term federal crime of terrorism means an offense that, subsection A, is calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct. And subsection B is a violation, and we know he's pled guilty to one of those offenses, so B is -- the government's met its burden of proof on B.

I am not satisfied that the government met the burden of proof on A, and I cannot find any case that really addresses this because this is a civil war when Al-Qaeda is acting badly and the Houthis are acting badly and they are fighting each other in this instance. In other words, he was recruited, as I understand, to fight the Houthis, who by the way, are enemies of the United States and are friendly with Iran, and so the Saudi Arabian government and the United States are lending aid to the Houthi enemies, not to Al-Qaeda, but to Houthi enemies. And so this requirement, this 12-point enhancement, is not there for nothing.

In other words, it's a huge enhancement. It makes an enormous difference to this man, to this defendant, and I am not satisfied without more proof from the United States that the government has met its burden to show that this enhancement should apply to a civil war. Yes, Al-Qaeda is a terrorist organization. Yes, it's a terrible terrorist organization, but there's nothing in the presentence report or the videos or the pictures or the statement of facts that indicate to me that he was engaged in trying to influence or effect the conduct of government, even -- and we're talking about the Yemeni government, by intimidation or coercion.

You have the burden there, and doesn't have to be the United States government. It has to be government established order. And Houthis weren't it and still aren't. Although

they've made substantial progress, I believe. So the burden's on you.

MR. SIGLER: That's correct, Your Honor. I'll note that we received this pleading yesterday. We were prepared if the case had gone to trial to bring someone from the Pentagon as a witness to say that there were three forces in state of play there: The legitimate government of Yemen, which AQAP fiercely opposes because they wanted to control that part of the world. And the Houthis were a second antagonist for AQAP, so when he allied himself with AQAP, that entity at the time we're talking about in late 2014 was opposing by force the legitimate government of Yemen where they had sort of been in de facto control themselves in this part of Yemen, and the Houthis. You had three people vying for control or three entities, and one of those was the legitimate government of Yemen.

And so if we had gone to trial, we would have put an expert on the stand to say they were not merely opposing AQAP opposing the Houthis, but they were at the same time simultaneously opposing legitimate government of Yemen. And that's why it would apply because Al-Qaeda only engages in violence to achieve its ends, and that was one of the actors that AQAP was opposing.

THE COURT: Well, that is not in the presentence report. I am not satisfied that it is appropriate to overlay

this fact with what is in the presentence report, which definitely supports that he was joining Al-Qaeda. Maybe involuntarily, but he was joining Al-Qaeda, he pled guilty to joining the terrorist organization of Al-Qaeda. But why in the world have this horrible enhancement if it doesn't mean something. It has to mean something. And so I'm going to deny the enhancement. And so I just don't think you've met your burden of proving that.

He has the -- we have the videos, I know it seems to me that during the plea agreement or at some point, I have seen some of these photographs. I don't know that I saw a video. I think I saw a video -- photograph maybe taken from a video. And it is pretty scary. It's frightening to see these people coming through with their ISIS flags and their military weapons and their threats. And we know what they're capable of doing because they've killed thousands of Americans. And so that is all true. But I don't -- now I am -- I don't have the organization of Al-Qaeda before me. I have one individual who was, who did join Al-Qaeda and as best I know, he was fighting the Houthis at this juncture. He left within the year. I mean, he wasn't even there a year. He was there from July to January or December.

MR. HALL: July 14 to January 15.

THE COURT: And so this is a difficult burden. Again, I think that it's easy to say that if you're convicted

of one of the offenses as he is under subsection b, 2332b, if you're convicted of one of those, you just automatically get the enhancement because it's possible to get the enhancement and not be convicted of one of these. In other words, it's possible. But it seems to me I shouldn't automatically stick him with a 12-point enhancement. No one here knew about it. We had to get people from Washington to tell us what the truth was, so to speak. And I just think that you've made your record.

You can appeal. I think maybe you should appeal. It's new to me. This is a -- I know you don't want them to, but they're free to appeal this finding. But, again, I have not seen, and I tried to research it today to determine whether anyone has faced this, and most of the cases involve proof of specific intent or any evidence to support the finding, and not only evidence and I'm really doing lack of evidence to support this finding is what I'm finding.

MS. WILLIAMS: Thank you, Your Honor.

THE COURT: A civil war and it's just a mess over there. Is it still just as big a mess as ever? It was a humanitarian disaster. So it's just terrible what's happening over there. But in any event, I think he's lucky to be back here even in jail. But anyway, I'm denying that.

Now do you have any other objections?

MR. HALL: No.

THE COURT: Do you have any objections to the presentence report?

MS. WILLIAMS: We do not, Your Honor.

THE COURT: Are you going to ask the Court for an additional point for acceptance?

MS. WILLIAMS: We are, Your Honor.

THE COURT: The Court will grant that. The Court adopts the presentence report as amended. Specifically, I am denying the enhancement for 12 points that was in paragraph number 21. Therefore, the Court finds and the Court grants the government's motion for an additional point for acceptance. The total offense level is now 25. The criminal history category is I. The sentencing range is 57 to 71 months' incarceration followed by as much as a lifetime of supervised release following imprisonment. The fine range is $20,000 to $200,000. Restitution is payable in the amount of $100 -- I'm sorry, special assessment is $100. There is no restitution.

Is that correct?

THE PROBATION OFFICER: Yes, ma'am.

THE COURT: Everyone agrees that I've calculated that correctly?

MR. HALL: One question. You included the two points in paragraph 20?

THE COURT: I did.

MR. HALL: I thought so. Thank you.

THE COURT: I did. I'm just -- you can appeal that. I'm just saying that the way I understand that enhancement and the evidence that I'm considering is what's in that presentence report, the offense conduct. And it seems to me a fair inference that he intended that this be used for violence. It doesn't have to be violence against the government. It doesn't say that. The enhancement for number -- for the 12-point enhancement does involve coercion against a government or intimidation against a government.

And I just don't think that anything in this presentence report supports that. I admit that if we were to go to trial, the government might have been able to prove that. Of course, you could always put on evidence to refute it. But that's my finding. All right. Now I'm going to ask that the defendant and his interpreter, Mr. Al-Rayanni, would you please come forward.

Mr. Al-Rayanni, have you heard what the Court has ruled so far? Have you understood what the Court has ruled so far?

THE DEFENDANT: Yes.

THE COURT: Now I'm going to ask -- I guess I should ask the government this. I guess you have no evidence to put on with respect to sentencing; is that correct? Ms. Williams?

MS. WILLIAMS: No, Your Honor.

THE COURT: Now, are you going to put on any evidence with respect to the sentence, Mr. Hall?

MR. HALL: No.

THE COURT: Mitigating, all right. You may address the Court with respect to the appropriate sentence and, of course, Mr. Al-Rayanni, you have an absolute right to address the Court.

MR. HALL: When the government came to him, he was working at a convenience store in Phillips County with a relative.

THE COURT: His brother, wasn't it?

MR. HALL: Yes. He came back to the U.S., lived a quiet life, but somehow by Facebook they were able to find -- Facebook is the bane of all defendants. I don't know how many cases I've had where Facebook has been a lead or evidence.

THE COURT: That is right. And actually terrorists just don't understand how much the government looks at Facebook. And other criminals as well.

MR. HALL: Drug dealers, people handling handguns, admitting to violent crimes, it's amazing. They brag about it. Nevertheless --

THE COURT: It's good for your business.

MR. HALL: So he's back in Helena living a quiet life working in a convenience store, and they come and ask him -- he drives up to talk to the FBI in West Memphis. I think that's what it was. And he talks to them and tells them everything he did. He was forthcoming, not knowing that he was

admitting to a crime, but nevertheless, he committed one. And now he's been in custody for 37 months because he was arrested in July of 2019, indicted about the same time.

He's not a threat to anybody. When he was there, he was impressed into service, but he committed a crime. Everybody knows what Al-Qaeda is. He was born -- he was age 10 when September 11th happened, and you just can't be a sentient human being and not know what Al-Qaeda is. I didn't even hear of it until George Bush mentioned it on TV the next night. But the government knew.

THE COURT: You hadn't heard of Osama bin Laden?

MR. HALL: I had heard of him, but I hadn't necessarily of Al-Qaeda. Everybody had heard of Osama bin Laden. The pictures of him with the luxury cars in the United States, I remember those even before that happened. But nevertheless, this is not a violent person. And I submit to the Court that the lowest possible sentence you can give him even going below the guidelines is appropriate, because -- and you could give him, say, ten years of supervised release to make sure he doesn't do anything else.

He's 31 now. Ten years, he'll be 41. But he did this when he was 23. Now here we are eight years later, eight years. He ought to get some credit for that. Of course, he's been in jail, he can't do anything in jail. Can't join up with Al-Qaeda, can't do much of anything. Talks to his family on

the phone, he calls me about once every two weeks. Occasionally I drive to Morrilton to see him. He's been in the same jail for three years. He hadn't had a hair cut in a while, and actually it's kind of becoming compared to the hair he had before. He's learned English in jail. Not a good place to be learning because your vocabulary is limited, that's why he's got the interpreter, because Arabic is still his first language. That's why he needs the interpreter today.

But the government's interest in justice, the rule of law has been satisfied by this conviction. So any amount of time you give him is just piling on, I think, personally. And the county jail time, I've said this with everybody who's been in jail more than a year, it's really hard time compared to being in a prison because you get no programs, you don't get much interaction with other inmates because you're always locked down in a county jail. You sometimes don't even get rec time, recreational time. Let me be more specific for the benefit of the record. So that should have some factor into it too, that it's harder time than being in a prison. And that's why I request the Court to go down to 48 months. BOP would calculate his time and it wouldn't be time served. It would be close to it, but it would not be time served.

THE COURT: One goal of sentencing, of course, some people think it's the only goal, but it's not, is education, rehabilitation, preparing the inmate to be productive when he

is released. This man has an 8th grade education and I would like to see him get some vocational and educational training before he's let go. That's one of the sentencing goals. It's certainly not the only one. To hear some defense lawyers, you would think that that is it.

I've had lots of people come up and say, oh, Judge, sending my client to jail isn't going to help anyone. Well, punishment is a goal. But anyway, I do think rehabilitation is something, and I'm talking about helping him so he'll have maybe a broader view of the world and maybe won't be tempted to go into this business again. Not that he would. Is he on the no fly list?

MR. HALL: I would assume he is.

THE COURT: Do you all know?

MR. SIGLER: Your Honor, we can't address that in open court. It's a classified matter. I don't know the answer, but we can't discuss that in open court.

THE COURT: We could certainly have an in camera even revelation of it. But you cannot be of help?

MR. SIGLER: No.

THE COURT: I didn't realize it was classified because you read about people who are on it, who are furious. I didn't know it was classified.

MR. HALL: I didn't either.

THE COURT: Anything more?

MR. HALL: No, Your Honor. Thank you for your consideration and the obvious amount of time you've spent on this.

THE COURT: He has spent a lot of time at Morrilton.

MR. HALL: I'm talking about you, talking about the time you've spent on this.

THE COURT: Oh. Well, I feel bad for him much more than I do for me. I just don't -- I don't like bad statistics that show I'm a slow judge. But I'm fixing to quit.

MR. HALL: The last one was because I had been exposed by three people within 24 hours and I felt obliged to tell the Court. And remarkably I didn't get it.

THE COURT: Good.

MR. HALL: Everyone around me has had it, but I have not yet had it.

THE COURT: I've already had it. You've probably had it and just don't know it. But masks don't work, in my view.

MR. HALL: I thought maybe I was typhoid Mary and I was carrying it but not catching it.

THE COURT: I don't want to be politically incorrect, but I don't believe in those masks. All right. Now, Mr. Al-Rayanni, you have a right to address the Court. You have an absolutely right.

THE DEFENDANT: I am terribly sorry about what has

happened. I feel very remorseful. I have never learned that the Al-Qaeda is an illegal organization. I found out all the information about them later on and when I went back to my country. I used to be -- I was 23 years old when I joined. And young people learn from their mistakes. That is all.

THE COURT: Do you have any plans to get more schooling, more education?

THE DEFENDANT: Yes, I do. As soon as I leave the institution where I am right now.

THE COURT: Now I'll ask the United States to make a statement with respect to the appropriate sentence. You may stand there or you can come up here if you'd like, Stacy.

MS. WILLIAMS: I'll stay here, Your Honor, if it's okay.

THE COURT: I can see you.

MS. WILLIAMS: The United States believes that a guideline sentence is appropriate in this case and we are asking for a guideline sentence because of the nature of the conduct. Some of the videos on his phone, he was very much going down the radicalization -- I don't know if he was there all the way, but he was going down that avenue. There were beheadings, not beheadings, but there were like execution videos. He had a lot of ISIS propaganda on that cell phone that we found. And we want to deter other people from this conduct even in foreign countries or here, we don't -- it's a

scary line and we have to deter this conduct. And a guideline sentence of 57 to 71 months would be appropriate.

One more thing. He will retain his citizenship although the United States had hoped that he would lose it because we believe he obtained it -- he got citizenship by fraud. However, a Supreme Court case came down that said his father was the one who fraudulently got him citizenship and the defendant cannot be held liable for his father's actions. So we've worked a lot with immigration and with the state department and he will retain his citizenship and that is a great benefit as well to him. We would have liked to have him deported, but as it is, he's facing 57 to 71 months which is not a bad sentence considering he's already spent three years in custody. And the United States believes that that is sufficient but not greater than necessary. Can I have a moment just to ask my co-counsel if he has anything else?

THE COURT: Of course.

MS. WILLIAMS: Nothing further, Your Honor.

THE COURT: All right. Would you like the last word?

MR. HALL: The phone may have shown things that would indicate potential radicalization, but by the time that phone was seized, many years had passed and nothing had happened, not an inkling that I know of. I don't know what the government knows because they don't have to tell me, but from

all I've seen, nothing progressed after he got back here. And you could argue what's an American citizen's First Amendment rights when they're overseas, to look at a video and to have it, keep it on your phone. I don't even know what's on my computer sometimes because we do child porn cases, you go to a website and things start popping up on your computer, thumbnails show up, images show up that you didn't ask for because you looked at it, it got copied.

That happens. And that's still a crime under the child porn laws, but these radicalization issues, nothing happened between 2015 when he got back and 2019 when he got arrested. Four years. And, of course, he's in jail, you can't count that, he wasn't doing anything in jail. And I'm sure they listened to his phone calls. With his brother, they probably spoke Arabic, but I'm sure somebody listened to the phone calls. We have no indication that anything happened.

THE COURT: In jail, they listen to the phone calls, and if they get the right kind of warrant, in some cases even if they don't have the right kind of warrant, they might be able to listen when he gets out. So we know that's happened.

MR. HALL: We know they listen to phone calls. I had a trial with Ms. Williams where they emailed me every day the phone calls between the client and his family. And I didn't have the time to listen to them. I gave them back to the wife and said you listen to them, tell me what they found.

THE COURT: There have been bulk data collections and the FBI and/or its contractors have improperly listened. That's all I'll say.

MR. HALL: We'll cross that bridge when we get there, but we're not there yet.

THE COURT: We're not. Is there any reason I shouldn't impose sentence now?

MR. HALL: No, ma'am.

MS. WILLIAMS: No, Your Honor.

THE COURT: I have reviewed --

THE INTERPRETER: Your Honor, I would like to say something.

THE DEFENDANT: Would you allow me to say something?

THE COURT: Of course.

THE DEFENDANT: I am a peaceful person. I lived in the United States for 15 years. I have never done anything against the law. I didn't have any run-in against the law. I had no problems with the legal system. That's it.

THE COURT: I know that, or at least that's what the presentence report indicates. I have reviewed the presentence report, I have listened to what -- is there something else he wanted to say?

THE INTERPRETER: No.

THE COURT: I've reviewed the presentence report, I've listened to what everyone in this courtroom has had to

say. And I am prepared to impose a guideline sentence. The Court will impose a sentence of 65 months, which is roughly midway. One reason I'm imposing a mid-guideline sentence is I am considering as a mitigating factor that he has spent a lot of time in Morrilton in the Conway County jail, I assume. And I cannot imagine that that is a very comfortable place, and there are a number of reasons he's had to linger there, none of which are really his fault. Some are things that the government and the Court were having to deal with and Mr. Hall. So I just find that that is a mitigating factor.

I also want him to spend some time just as punishment for joining Al-Qaeda and I want him to be able to get some more education, learn more English, maybe get a GED while he is incarcerated. I'm also considering under 18, United States Code, Section 3553(a) the factors listed including the sentencing guidelines, the need for punishment, the need to deter him and others from similar conduct. I'm considering the need for respect for the law. And I find that this sentence is no more severe than necessary to effect the purposes of the sentencing laws of the United States.

While you're incarcerated, Mr. Al-Rayanni, I recommend that you participate in educational and vocational programs. Once you're released from prison, you'll be on supervised release for ten years. You're to report to the probation office in the district to which you are released within 72

hours of your release. And you are to comply with all mandatory and standard conditions. You must cooperate in the collection of DNA as directed by Probation. The Court will not impose a fine because you're not likely to be able to pay a fine. But you must pay a 100-dollar special assessment which is mandatory. Should I recommend a particular institution, Mr. Hall?

MR. HALL: I'd say something close to family, either Memphis or Forrest City. Memphis would actually be closer.

THE COURT: I'll say Memphis or Forrest City to be close to family.

MR. HALL: He also has family in New York City, one brother who's in constant contact with me, but I think this part of the country would be better.

THE COURT: I will say that. I don't want to just say Memphis. I think Memphis and Forrest City are reasonably close together and so I'm just going to say Memphis or Forrest City unless you want me to just say Memphis.

MR. HALL: No.

THE COURT: I will say to be close to family. Are there any other aspects of this sentence that I need to explain for the record?

MS. WILLIAMS: No, Your Honor.

THE COURT: What about you, Mr. Hall?

MR. HALL: No, Your Honor.

THE COURT: It is a guideline sentence. I will recommend Memphis or Forrest City. I'm sorry it took so long to get to your case following your guilty plea. I'm trying to consider that with respect to this sentence. If there's nothing more -- oh, I need to tell him about his right to appeal. Mr. Al-Rayanni, you have the right to appeal your conviction if you believe your guilty plea was involuntary or unlawful or if there was some fundamental defect in the proceeding that you didn't waive when you pled guilty. You also have a right to appeal the sentence I just imposed, particularly if you think it's contrary to law or an abuse of discretion. With few exceptions, you must file your notice of appeal within 14 days of judgment being entered against you. You have the right to an attorney and to have notice of appeal filed for you.

Mr. Hall, you are appointed, are you not?

MR. HALL: Retained.

THE COURT: Okay.

MR. HALL: Thanks to his family.

THE COURT: If you cannot afford to pay the costs of an appeal, you may apply for leave to appeal in forma pauperis and if you so request, the clerk of court who is here today will prepare and file the notice for you once the Court has entered judgment against you. Do you understand what I just said?

THE DEFENDANT: Yes.

THE COURT: Mr. Hall, would you and Ms. Nasief stay after court just for a moment so you can discuss with him his right to appeal and whether he wishes to file a petition to appeal in forma pauperis? Can you do that?

MR. HALL: I will.

THE COURT: A lot of times in my experience, retained attorneys run out of their retainer at this point in the litigation, and the defendant might not have enough money to keep you going as his lawyer. So just to move things along, I'd like you to do this. We can provide you with a form for that, an IFP affidavit. He has to tell the truth, of course, on the affidavit. But we can get this ball rolling and usually you'd be the one. I don't guarantee it. But usually you'd be the one to be appointed to represent him.

MR. HALL: That's what the Eighth Circuit does.

THE COURT: I know. We were just talking about that.

MR. HALL: If you try the case, you're going to be appointed for the appeal. Which is logical.

THE COURT: It is. But anyway, you know how to do that and you'll take care of it, you're telling me?

MR. HALL: Yes.

THE COURT: Thank you so much. Anything more?

MS. WILLIAMS: No, Your Honor. Thank you.

THE COURT: Court's in recess. Thank you.

(Proceedings adjourned at 1:46 PM.)

REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript of proceedings in the above-entitled matter.

/s/ Karen Dellinger, RDR, CRR, CCR
----------------------------------
United States Court Reporter

Date: September 30, 2022